**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>TYLER SHANE WELLS and )<br>ALEXANDER BONILLA-SERVIN ) | CASE NO. 3:26-CR-14<br><br>JUDGES CRYTZER/McCOOK |

**UNITED STATES RESPONSE IN OPPOSITION TO**
**DEFENDANTS' JOINT MOTION TO DISMISS FOR UNLAWFUL ENTRY [DOC. 47]**

The defendants invoke the Fourth Amendment to shield a home from government intrusion. The problem is there was no home—just dirt, lumber, and concrete spread across thirty acres of a commercial construction site that no one had ever occupied. The open fields doctrine defeats their claim. Federal immigration statutes independently authorized the officers' presence, as they attempted to enter Sagittarius Lane from Hardin Valley Road. Neither defendant has standing to challenge the officers' attempted entry onto the construction site. And dismissal is not a remedy the law recognizes for the alleged violation. Their Joint Motion to Dismiss for Unlawful Entry [Doc. 47] should be denied.

## I.  STANDARD OF REVIEW

A defendant seeking to suppress evidence bears the burden of establishing that his Fourth Amendment rights were violated. *Rakas v. Illinois*, 439 U.S. 128, 131 n.1 (1978). The threshold question is whether the defendant has a reasonable expectation of privacy in the area searched. *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). Where no such expectation exists, the Fourth Amendment is not implicated, and the analysis ends.

## II. SAGITTARIUS LANE AND THE CONSTRUCTION SITE CONSTITUTE AN OPEN FIELD, NOT CURTILAGE

The open fields doctrine, established in *Hester v. United States*, 265 U.S. 57 (1924), and reaffirmed in *Oliver v. United States*, 466 U.S. 170 (1984), holds that the Fourth Amendment's protections do not extend to open fields. An open field "need be neither 'open' nor a 'field' as those terms are used in common speech." *Oliver*, 466 U.S. at 180 n.11. The doctrine rests on the principle that "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Id.* at 178.

Sagittarius Lane leads to a commercial construction site spanning nearly thirty acres and containing fifty-five planned building lots. Not one residence had been completed. Not one had been occupied. The defendants' own motion concedes this point: "None of the townhomes in that development were complete on that date . . . and no residents lived there." [Doc. 47 at 2]. The defendants call it a "residential construction site" [Doc. 47 at 1], but there were no residences— only dirt, lumber, and concrete. The site was a commercial construction zone, not a dwelling. The Supreme Court has recognized that the Fourth Amendment protects commercial buildings as well as homes, *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978), but that protection extends to the interior of the building, not to outdoor areas accessible to employees, visitors, and delivery vehicles. The area surrounding a commercial construction site—including an access road—is the functional equivalent of an open field. And this construction site is off a major thoroughfare, Hardin Valley Road, which is where the officers attempted to turn from onto Sagittarius Lane before Bonilla-Servin in his active blockade stopped them with his truck.

The factors set forth in *United States v. Dunn*, 480 U.S. 294, 301 (1987), for distinguishing curtilage from open fields confirm this conclusion: (1) the proximity of the area to the home; (2) whether the area is within an enclosure surrounding the home; (3) the nature of the uses to which

the area is put; and (4) the steps taken to protect the area from observation by passersby. *Id.* Here, no home existed. No enclosure surrounded a residence. The area was used for commercial construction, with workers and vehicles entering and exiting daily. And while the defendants point to "No Trespassing" signs, such signs do not create a reasonable expectation of privacy in an open field. *Oliver*, 466 U.S. at 182 ("[I]t is not generally true that fences or 'No Trespassing' signs effectively bar the public from viewing open fields"). The Supreme Court has squarely held that "the government's intrusion upon the open fields is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment." *Id.* at 177. Signs do not morph fields into homes. *See United States v. Rapanos*, 115 F.3d 367, 372–73 (6th Cir. 1997) ("[T]he presence of fences, closed or locked gates, and 'No Trespassing' signs on an otherwise open field . . . has no constitutional import"); *United States v. Mathis*, 738 F.3d 719, 731 (6th Cir. 2013) (holding that property owner's subjective expectation of privacy in an open field was unreasonable).

The defendants may point to the recorded subdivision plat—which designates Sagittarius Lane as a private internal road (**Ex. A**)—as evidence that the officers attempted to enter constitutionally protected space. That argument mistakes property law for Fourth Amendment jurisprudence. The open fields doctrine does not turn on whether officers traveled over a public or private road to reach the open field. In *Oliver* itself, the officers walked past a locked gate and "No Trespassing" signs on private property, yet the Supreme Court held no Fourth Amendment search had occurred. 466 U.S. at 173, 182–83. The Sixth Circuit has followed suit. In *Widgren v. Maple Grove Twp.*, 429 F.3d 575, 580–81 (6th Cir. 2005), government officers advanced past "No Trespassing" signs posted at the property owner's driveway to reach a vantage point in the open fields. The Court held that no reasonable expectation of privacy existed in those open fields and that the government's conduct was not a Fourth Amendment search. The Ninth Circuit reached

the same conclusion on materially identical facts in *United States v. Roberts*, 747 F.2d 537, 541–42 (9th Cir. 1984), holding that an "unobstructed private road, akin to an open field, was not within curtilage" and that the defendant's "asserted expectation of privacy in the road [was] unreasonable by society's standards." The defendants' claim that their use of a gate and a "no trespassing" sign meant that "[l]aw enforcement was not permitted to enter the property." [Doc. 47 at 4]. The defendants are wrong. The use of a gate and "No Trespassing" sign, in what is the legal equivalent of an open field, offers no more protection to the defendants' harboring of illegal aliens at the site any more than a gate and sign would protect the defendants from operating an open-air methamphetamine lab on the site.

The plat's designation of Sagittarius Lane as a private road establishes only that the road is not publicly maintained—a fact of municipal infrastructure, not constitutional significance. A plat note telling the county not to plow a road does not tell the Fourth Amendment to protect it. The *Dunn* factors confirm this: Sagittarius Lane was not proximate to any completed dwelling; it was not enclosed within a fence surrounding a home; it served as a commercial access road for commercial construction vehicles, commercial workers, and material deliveries; and no steps were taken to shield it from observation. To the contrary, law enforcement conducted surveillance of the site from a parking lot across Hardin Valley Road—the development was plainly visible from public vantage points. When officers arrived on January 13, 2026, approximately twenty individuals "rapidly departed the development and ran into the woods." (**Ex. B ¶** 11). A site that twenty people can flee on foot into the surrounding woods is not an enclosed private space. It is an open field. The officers' attempted use of Sagittarius Lane, an alleged private road, to reach an unoccupied commercial construction site—which the defendants successfully impeded—does not transform that site into constitutionally protected curtilage.

### III. THE OFFICERS POSSESSED STATUTORY AUTHORITY TO SURVEIL, LOCATE, AND APPREHEND

Setting aside the open fields doctrine, the officers' entry was independently justified by their statutory authority to enforce federal immigration law. HSI and ERO officers are authorized by 8 U.S.C. § 1357(a) to interrogate, without a warrant, any person believed to be an alien regarding his right to be in the United States, and by 8 U.S.C. § 1226(a) to arrest aliens on administrative warrants.

On January 13, 2026, the officers were conducting surveillance of Wells's construction site on Sagittarius Lane, a site that federal immigration officers had suspected of harboring illegal aliens since at least December 20, 2025. Given that prior investigative focus on Sagittarius Lane, the officers attempted to enter the site to surveil, locate, and apprehend individuals unlawfully present in the United States. That is a core function of federal immigration enforcement. *See Abel v. United States*, 362 U.S. 217, 226–30 (1960) (holding that arrest under administrative deportation warrant was lawful and evidence seized incident thereto was admissible). Federal regulations reinforce this authority: 8 C.F.R. § 287.8(a) authorizes immigration officers to make warrantless arrests where the officer has reason to believe the person is unlawfully present in the United States and is likely to escape before a warrant can be obtained. The officers here had precisely that reason—when they arrived, approximately twenty individuals fled.

The defendants' argument that a judicial warrant was required to even attempt to enter Sagittarius Lane conflates the requirements for actually entering a home with those for entering a commercial construction site adjacent to a major thoroughfare. *Payton v. New York*, 445 U.S. 573, 590 (1980), requires a warrant to enter a suspect's home to make a routine arrest, but it does not extend to commercial properties, open fields, or access roads. And the Fourth Amendment's protections against warrantless entry are at their zenith in the home, not in a commercial

construction zone accessible to the general workforce. *See Donovan v. Dewey*, 452 U.S. 594, 598–99 (1981) (recognizing reduced expectation of privacy in commercial premises).

Lastly, in asserting that federal immigration officials must always have warrants in hand prior to enforcing federal immigration laws, the defendants imply that illegal aliens enjoy the same scope of rights that U.S. citizens enjoy under the Constitution's Bill of Rights. The United States disagrees with that premise. Although the Supreme Court has held that aliens "enjoy certain constitutional rights . . . when they have come within the territory of the United States and developed substantial connections with this country," it expressly declined to decide whether "the Fourth Amendment applie[s] to illegal aliens in the United States." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271–72 (1990). It also reiterated that some constitutional provisions were "not intended to extend to aliens in the same degree as to citizens." *Id*. at 273; *accord United States v. Escobar-Temal*, 161 F.4th 969, 983 (6th Cir. 2025) (holding that a prohibition against firearm possession by illegal aliens, 18 U.S.C. § 922(g)(5)(A), is consistent with the Second Amendment and the nation's tradition of firearm regulations); *id*. at 986, 997 (Thapar, J., dissenting in part and concurring in the judgment) (opining that, as "[o]riginally understood, neither the First nor Fourth Amendment clearly extends to noncitizens" and that, with respect to the Second Amendment, "illegal aliens are not citizens [and] cannot lay claim to the right to bear arms reserved for 'We, the People.'").

IV. **THE DEFENDANTS LACK STANDING TO CHALLENGE THE ENTRY ONTO PROPERTY THEY DO NOT OWN**

Fourth Amendment rights are personal and cannot be asserted vicariously. *Rakas*, 439 U.S. at 133–34; *see also Minnesota v. Carter*, 525 U.S. 83, 90 (1998) (noting that a person "merely present with the consent of the householder" lacks standing to challenge a search); *United States v. Pollard*, 215 F.3d 643, 647–48 (6th Cir. 2000) (codefendant who had never visited the residence

lacked standing to contest search). To challenge the officers' attempted entry onto Sagittarius Lane, each defendant must demonstrate that he personally had a reasonable expectation of privacy in the area entered, which was just off Hardin Valley Road. Wells was the site superintendent—an employee, not the property owner. Bonilla-Servin was a worker strategically operating a pickup truck on the access road. Neither defendant has established an ownership interest in Sagittarius Lane or the surrounding property. Neither resided there. Neither had unfettered access independent of his work shifts—the very factors the Sixth Circuit examines in determining whether a defendant's connection to a property confers standing. *See United States v. Heath*, 259 F.3d 522, 533 (6th Cir. 2001) (standing existed only because the defendant had stayed at the residence weekly for two years, possessed a key, and maintained unfettered access). Neither defendant comes close to that threshold. An employee does not acquire a constitutional right to exclude the government from attempting to enter his employer's access road.

Relatedly, neither Wells nor Bonilla-Servin has standing to be on the construction site by permission of their employer. The Supreme Court has squarely rejected the notion that a person acquires Fourth Amendment standing merely by being "legitimately on premises." *Rakas*, 439 U.S. at 142 (holding that "legitimately on premises" standard "creates too broad a gauge for measurement of Fourth Amendment rights"). An overnight guest may claim the protection of the Fourth Amendment, but "one who is merely present with the consent of the householder may not." *Minnesota v. Carter*, 525 U.S. 83, 90 (1998). The distinction is critical here. Wells and Bonilla-Servin were not overnight guests on Sagittarius Lane—indeed, there was nothing there to accommodate them. They were not residents. They were daytime workers at a commercial construction site owned by someone else—closer to the "casual visitor" who, in the Court's words, "walks into a house one minute before a search" and "leaves one minute after." *Rakas*, 439 U.S.

at 142. And the operational realities of a construction site further diminish any claimed expectation of privacy. *See O'Connor v. Ortega*, 480 U.S. 709, 717 (1987) (plurality opinion) ("[P]ublic employees' expectations of privacy in their offices, desks, and file cabinets . . . may be reduced by virtue of actual office practices and procedures, or by legitimate regulation."); *see also Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980) (defendant lacked standing where he had taken no "normal precautions" to maintain privacy and failed to establish a sufficient relationship to the place searched). A commercial construction site accessible to dozens of workers, delivery vehicles, and visitors is not a place where any single employee can claim an expectation of privacy that society is prepared to recognize as reasonable.

## V.  DISMISSAL IS NOT AN AVAILABLE REMEDY

Even if the defendants could establish a Fourth Amendment violation—and they cannot—dismissal of the indictment would not be the proper remedy. The exclusionary rule provides that evidence obtained in violation of the Fourth Amendment may be suppressed. *Mapp v. Ohio*, 367 U.S. 643 (1961). It does not provide for dismissal of an indictment. A valid indictment returned by a properly constituted grand jury is not subject to dismissal on the basis that evidence before the grand jury was obtained in violation of the Fourth Amendment. *United States v. Calandra*, 414 U.S. 338, 345 (1974). The remedy for a Fourth Amendment violation—if one even occurred—is suppression of the evidence, not dismissal of the charges. The defendants ask for a remedy that does not exist.

The defendants' motion appears to rest on a chain of reasoning that goes roughly like this: the officers attempted to enter Sagittarius Lane unlawfully from Hardin Valley Road; that unlawful attempted entry led to the discovery and arrest of workers who fled the construction site to hide among homes in an adjacent neighborhood; and the fruit of that poisoned tree must be

suppressed—or, in their formulation, the indictment must be dismissed. The argument fails at every link. But even accepting the defendants' dubious first premise, the chain breaks at the second. The arrests did not flow from any immigration officers attempted entry onto Sagittarius Lane. The arrests of the six illegal aliens occurred in the adjoining neighborhood.

Under *Wong Sun v. United States*, 371 U.S. 471 (1963), evidence derived from an unconstitutional search or seizure is inadmissible as "fruit of the poisonous tree" only if it was "come at by exploitation of that illegality." *Id.* at 488 (quoting *Maguire, Evidence of Guilt* 221 (1959)). The question is whether the evidence was obtained "by exploitation of" the initial illegality or "instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* The connection between the challenged conduct and the evidence sought to be suppressed must be direct, not attenuated.

Here, there is zero connection. Law enforcement made all six arrests of the individuals identified in Counts Five through Ten not at the construction site on Sagittarius Lane, but in the adjoining residential neighborhood—a public area to which the officers had independent and lawful access. When officers attempted to enter the construction site, approximately twenty individuals fled into the surrounding woods and the adjoining neighborhood. (**Ex. B ¶** 11). The officers who apprehended the six individuals did so in the neighborhood, on public streets and in the curtilage of homes, including at the request of some homeowners—areas where the defendants enjoyed no reasonable expectation of privacy. The arrests were the product of independent police work in a public space, not the exploitation of any attempted entry onto Sagittarius Lane. Indeed, local homeowners in the adjoining neighborhood, including several who called 911, specifically requested law enforcement enter their property to arrest the illegal aliens hiding in and around the

homes and neighborhood. *See* R. 54, Response in Opposition to Wells' Motion to Reopen Detention Hearing, at 2-5.

The Supreme Court's attenuation doctrine, refined in *Utah v. Strieff*, 579 U.S. 232 (2016), identifies three factors for determining whether the connection between unconstitutional conduct and the discovery of evidence is sufficiently attenuated: (1) the temporal proximity between the unconstitutional conduct and the discovery of evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Id.* at 239 (citing *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)). All three factors favor the United States.

First, temporal proximity. The arrests in the adjoining neighborhood were not the product of the officers' attempted entry on Sagittarius Lane. The individuals fled the construction site of their own accord—after Bonilla-Servin caused his truck to come into contact with the officers' vehicle—and the six individuals were later apprehended at separate locations after independent encounters with officers who responded to the surrounding area.

Second, intervening circumstances. The individuals' flight from the construction site was itself an intervening act that broke whatever causal chain the defendants posit. Officers in the neighborhood had independent authority—and independent reason—to approach individuals encountered in public.

Third, the purpose and flagrancy. The officers acted in good-faith exercise of their statutory authority to surveil, locate, and apprehend individuals unlawfully present in the United States, not in flagrant disregard of constitutional rights. They attempted to enter the site to conduct immigration enforcement, which they were statutorily authorized to carry out.

The Sixth Circuit has applied *Strieff* to find attenuation in analogous circumstances. *See, e.g., United States v. Gross*, 662 F.3d 393, 405–06 (6th Cir. 2011) (attenuation found where

10

intervening circumstances broke the causal connection between the initial encounter and the discovery of evidence). And the exclusionary rule does not extend to the "body" or identity of a defendant. *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039–40 (1984) ("The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest."). The defendants cannot suppress themselves. The illegal aliens' presence at Wells' construction site, their flight into the adjacent neighborhood, and their subsequent arrest are not "evidence" subject to exclusion under *Wong Sun*.

By the same logic, Wells and Bonilla-Servin cannot suppress the bodies or identities of Individuals 1 through 6 — the illegal alien workers identified in Counts Five through Ten. Fourth Amendment rights are personal. *Rakas*, 439 U.S. at 133–34. Wells and Bonilla-Servin may not vicariously assert the Fourth Amendment rights of third parties. And under *Lopez-Mendoza*, the physical presence of those individuals is not subject to suppression in any event. That is, neither the defendants' own bodies nor the bodies of the illegal alien workers they harbored can be excluded as fruits of an allegedly unlawful entry. *See United States v. Crews*, 445 U.S. 463, 474 (1980) ("Respondent is not himself a suppressible 'fruit,' and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct."); *Alderman v. United States*, 394 U.S. 165, 174 (1969) ("Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.").

## VI. CONCLUSION

The defendants invoke the Fourth Amendment to shield a home from government intrusion. The problem for the defendants is there was no home—just dirt, lumber, and concrete spread across thirty acres of a commercial construction site that no one had ever occupied. The open fields doctrine defeats their claim. Federal immigration statutes independently authorized the

officers' presence. Neither defendant has standing to challenge the officers' attempted entry onto the site. And dismissal is not a remedy the law recognizes for the alleged violation. Their Joint Motion to Dismiss for Unlawful Entry [Doc. 47] should be denied.

Respectfully submitted,

FRANCIS M. HAMILTON III,
UNITED STATES ATTORNEY


*s/David P. Lewen, Jr.*
DAVID P. LEWEN, JR.
Assistant United States Attorney
TN Bar No. 042915
800 Market Street, Suite 211
Knoxville, TN 37902
(865) 545-4167
david.lewen@usdoj.gov


*s/ Russ Swafford*
RUSS SWAFFORD
Assistant United States Attorney
Tennessee Bar No. 034803
1110 Market Street, Suite 515
Chattanooga, Tennessee 37402
(423) 385-1332
russ.swafford@usdoj.gov